

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | | |
|---|---|---|
| **DAVID JACKSON,** | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | **Civil Action No. 3:18-CV-1699-S(BH)** |
| | § | |
| **ROYAL CARIBBEAN CRUISES, LTD,** | § | |
| **ROYAL CARIBBEAN INTERNATIONAL** | § | |
| **ROYAL CARIBBEAN CRUISE LINES,** | § | |
| **and OTHER UNKNOWN PARTIES NOT** | § | |
| **YET IDENTIFIED BY NAME,** | § | |
| **Defendants.** | § | **Referred to U.S. Magistrate Judge** |

**FINDINGS, CONCLUSIONS, AND RECOMMENDATION**

By *Special Order No. 3-251*, this case was automatically referred for full case management.

Before the Court for recommendation are *Royal Caribbean Cruises Ltd.'s Opposed Motion to Compel Arbitration*, filed July 27, 2018 (doc. 8), and *David Jackson's Motion for Summary Judgment*, filed August 23, 2018 (doc. 14). Based on the relevant filings and applicable law, both motions should be **DENIED**.

## I. BACKGROUND

David Jackson (Plaintiff) sues Royal Caribbean Cruises, Ltd. (Defendant) for breach of contract, breach of implied-in-fact contract, bad faith denial of the existence of a contract, common law fraud, Texas Deceptive Trade Practices Act violations, and loss of bargain.

**A.      Factual Background**

On January 15, 2017, Plaintiff called Defendant to reserve multiple cabins for a wedding on its ship departing from Galveston, Texas, on January 17, 2018 (January 2018 Cruise). (doc. 1-3 at 2; doc. 15-1 at 1-2.)[1] He spoke with a salesperson for Defendant, who offered a heavily discounted rate

---

[1] Citations to the record refer to the CM/ECF system page number at the top of each page rather than the page numbers at the bottom of each filing.

for thirty-one cabins if he paid a deposit to secure the reservation. (*Id.*) Later the same day, Plaintiff received an automated email with an attachment from Defendant. (doc. 15-7 at 17.) The email began with the following statement: "Please find the documents you requested below." (*Id.*) The rest of the email provided download instructions as well as the contact information for Defendant's Reservations Department. (*Id.*)

The attachment was a booking confirmation for two guests on the January 2018 Cruise and was dated January 15, 2017 (Booking Confirmation). (*Id.* at 18-20.) The first two pages of the Booking Confirmation contained general information, including the ship, date of the cruise, booking charges, cancellation schedule, booking itinerary, and government passenger requirements. (*Id.* at 18-19.) It noted that a $250 deposit had been paid, and the total amount due was $3,119.94. (*Id.* at 18.) The last page of the document contained the following paragraph:

> This booking is governed by the terms and conditions of the Cruise/Cruisetour Ticket Contract. A copy of the most current version of that contract can be viewed at www.RoyalCaribbean.com.

(doc. 15-7 at 20.)[2]

The Ticket Contract is eleven pages in length. (doc. 8-1 at 4-14.) The second unnumbered paragraph on the first page provides:

> THIS AGREEMENT REQUIRES THE USE OF ARBITRATION FOR CERTAIN DISPUTES AND WAIVES ANY RIGHT TO TRIAL BY JURY TO RESOLVE THOSE DISPUTES. PLEASE READ SECTION 10 BELOW.

(*Id.* at 4.) Section 10, on the seventh page, provides in relevant part:

---

[2] Defendant claims that the Ticket Contract can be accessed by clicking on a link labeled "Cruise Contract," which is located on the bottom of its homepage. (doc. 8-1 at 2.) Plaintiff claims that he never saw the Ticket Contract, and that "[t]he link is strategically placed so that it can hide behind your computer toolbar even if you scroll all the way down to the bottom of the screen." (doc. 15-1 at 7, 10.) Plaintiff also attaches multiple "screen shots" of Defendant's homepage. (docs. 15-11; 15-12.)

ARBITRATION OF ALL OTHER CLAIMS: ANY AND ALL OTHER DISPUTES, CLAIMS, OR CONTROVERSIES WHATSOEVER, EXCEPT FOR PERSONAL INJURY, ILLNESS OR DEATH OF A PASSENGER WHETHER BASED ON CONTRACT, TORT, STATUTORY, CONSTITUTIONAL OR OTHER LEGAL RIGHTS, INCLUDING BUT NOT LIMITED TO ALLEGED VIOLATION OF CIVIL RIGHTS, DISCRIMINATION, CONSUMER OR PRIVACY LAWS, OR FOR ANY LOSSES, DAMAGES OR EXPENSES, RELATING TO OR IN ANY WAY ARISING OUT OF OR CONNECTED WITH THIS CONTRACT OR PASSENGER'S CRUISE, NO MATTER HOW DESCRIBED, PLEADED OR STYLED, SHALL BE REFERRED TO AND RESOLVED EXCLUSIVELY BY BINDING ARBITRATION PURSUANT TO THE UNITED NATIONS CONVENTION ON THE RECOGNITION AND ENFORCEMENT OF FOREIGN ARBITRAL AWARDS (NEW YORK 1958), 21 U.S.T. 2517, 330 U.N.T.S. 3, 1970 U.S.T. LEXIS 115, 9 U.S.C. §§ 202-208 ('THE CONVENTION") AND THE FEDERAL ARBITRATION ACT, 9 U.S.C. §§ 1, ET SEQ., ("FAA") SOLELY IN MIAMI, FLORIDA, U.S.A. TO THE EXCLUSION OF ANY OTHER FORUM.

(*Id.* at 10.)

Plaintiff continued communicating with Defendant's employees regarding its ability to accommodate certain requests for his wedding, and on January 26, 2017, he received a response to those requests by email. (doc. 15-7 at 41-42; 46-47)  The email also noted that the rates for additional cabins had increased, but a previously quoted-rate would be honored if Plaintiff would "put the deposits down today."  (doc. 15-7 at 41.)  On the same day, Plaintiff spoke with a salesperson on the phone who said that payment of the deposit guaranteed his group reservation, and "nobody could take these cabins from [him]." (doc. 15-1 at 2).  He alleges that by paying the deposit, he entered into an oral contract with the salesperson, who "guaranteed [him] the biggest room on the ship along with approximately 30 other cabins at a heavily discounted rate...."  (*Id.*)  "The only other term was that [he] had the option of paying the balance due approximately 90 days before sailing or [he] could cancel the cruise with full refund by giving notice of cancellation approximately 90 days before sailing."  (*Id.*)  He claims that at no point during the phone conversation did the salesperson discuss an arbitration agreement or make any reference to the terms and conditions of a ticket contract. (*Id.*)

Later the same day, the salesperson emailed Plaintiff that his group reservation was completed. (doc. 15-7 at 26).  She confirmed that the discounted rate applied to each cabin and that final payment would be due on October 19, 2017. (*Id.*)  She also confirmed that "all monies are completely refundable all the way up until that date." (*Id.*)  She stated that she had "transferred [his] individual reservation into [his] group as well." (*Id.*)  The salesperson noted that she sent Plaintiff a "group invoice" that "summarize[d] [his] group as it stands." (*Id.*)  She further advised Plaintiff to be on the lookout for a "group agreement" that would be sent to him in the next two days. (*Id.*)  She explained that it "will summarize your group and go over your group amenities a little further." (*Id.*)  She finally noted that Plaintiff should fill out and return the attached "group function request form" "with all the information for your group event."[3] (*Id.*)

On the same day, Plaintiff received two automated emails from Defendant with attachments, including an invoice (Group Invoice) and receipt (Receipt) for the group reservation on the January 2018 Cruise. (docs. 15-7 at 21-35; 8-1 at 2.)  The body of both emails began with the following statement: "Please find the documents you requested below." (*Id.* at 25, 35.)  Both emails also included download instructions and the contact information for the Reservations Department. (*Id.*) The Receipt referred to a group reservation for the "Jackson Group" on the January 2018 Cruise. (*Id.* at 23-24.)  It noted that a total payment of $6,200 was charged, with payment posted on January 27, 2017. (*Id.*)

The first page of the 16-page Group Invoice stated that $6,450 in total payments had been paid. (*Id.* at 33.)  This included the $250 deposit transferred from Plaintiff's individual reservation. (*Id.*) It listed the net charges for the group reservation at $26,491.08. (*Id.*)  In a separate paragraph on the

---

[3] Plaintiff completed the "group function request form" and emailed it back to the salesperson on the following day. (*See* doc. 15-7 at 3.)

bottom of the page was the following statement:

> This group booking and each individual booked as part of your group shall be governed by the terms and conditions of the Cruise/Cruisetour Ticket Contract. A copy of the most current version of that contract can be viewed at www.RoyalCaribbean.com.

(*Id.*)

On January 27, 2017, Plaintiff received an email from Defendant's Group Support Department containing several attachments, including a Group Cruise Vacation Agreement (Group Agreement). (doc. 15-7 at 7-12.)  The email advised Plaintiff to review the Group Agreement and "sign and return it via fax or email by the date indicated." (*Id.* at 11.)

The first page of the Group Agreement stated that the rates quoted would apply thru February 25, 2017, and would be based on inventory availability. (*Id.* at 7.)  The last page of the 4-page agreement included the following statement: "All guests traveling in the Group agree to the terms and conditions as stated in the Cruise Ticket Contract." (doc. 15-7 at 10.)  Unlike the Group Invoice, there were no instructions or comments on how to access or review the terms and conditions in the Cruise Ticket Contract (Ticket Contract).  The next paragraph provided:

> THE TERMS AND CONDITIONS SET FORTH HERE IN SHALL NOT BE VALID UNLESS THIS AGREEMENT IS EXECUTED BY THE GROUP LEADER AND RETURNED TO THE CRUISELINE, ON OR BEFORE 02/03/2017. THIS AGREEMENT SHALL NOT BE BINDING UPON THE CRUISELINE UNLESS AND UNTIL EXECUTED BY AN AUTHORIZED OFFICER OF THE CRUISELINE.

(doc. 15-7 at 10.)  On the bottom of the last page are blanks for the "group leader's" name, signature, and date, as well as the return address for the executed agreement. (*Id.*)  Plaintiff did not review or execute this agreement.  (doc. 15-1 at 2.)

In February of 2017, Plaintiff continued corresponding with Defendant's employees regarding

wedding details, as well as the confirmation of certain requested functions and amenities for the group reservation. (doc. 15-7 at 48-52; 59-60; 62.)

On May 9, 2017, Plaintiff received four separate automated emails from Defendant. (doc. 15-7 at 102, 122, 135, 141). As with the prior automated emails, the body of each email began with the following statement: "Please find the documents you requested below." (*Id.*) The emails also included download instructions for the documents, as well as the contact information for the Reservations Department. (*Id.*) Attached to each email was a Receipt, two Group Invoices, and a Group Confirmation. (*Id.* at 100-41.) The Receipt stated that payments totaling $6,200 were posted on May 10, 2017. (*Id.* at 100-01.) Both Group Invoices were dated May 9, 2017, and included additional expenses related to the wedding and other requested amenities. (*Id.* at 105-21; 125-34.) They also contained the same paragraph referencing and incorporating the terms of the Ticket Contract, as well as its availability on Defendant's website. (*Id.*)

The Group Confirmation consisted of five pages. (doc. 15-7 at 136-40.) The first four pages of the Group Confirmation contained general information about the itinerary, payment and cancellation schedule, the stateroom numbers, the group amenities booked, and government passenger requirements. (*Id.* at 136-39.) Under the heading "Other Special Remarks" on the last page of the document, was the following paragraph:

> This group booking and each individual booked as part of your group shall be governed by the terms and conditions of the Cruise/Cruisetour Ticket Contract. A copy of the most current version of that contract can be viewed at www.RoyalCaribbean.com/cruiseticketcontract.

(*Id.* at 140.) Unlike the notice paragraphs contained in the other documents, this paragraph provided the direct URL address to the Ticket Contract, and the website address was underlined. (*Id.*)

On October 2, 2017, Plaintiff called Defendant to transfer his reservation from the January

2018 Cruise to another ship departing from Galveston on September 17, 2018 (September 2018 Cruise). (docs. 15-1 at 2; 8-1 at 2.)[4]  As with the prior reservation, the parties orally agreed that Plaintiff would be guaranteed thirty-one cabins at a "heavily discounted rate" if he paid a deposit to secure the reservation. (doc. 15-1 at 2-3.)  The salesperson confirmed that the new reservation would be subject to the same terms agreed to in the previous reservation. (*Id.* at 4.)  The parties also orally agreed that Plaintiff was to pay the remaining balance approximately ninety days before the departure date. (*Id.* at 2-3.)  Per Plaintiff's request, Defendant cancelled the reservation on the January 2018 Cruise and transferred his deposit to a new group reservation on the September 2018 Cruise. (docs. 15-1 at 4; 8-1 at 2.)  Plaintiff maintains that at no point during the phone conversation did the salesperson discuss an arbitration agreement, or reference the terms and conditions of a ticket contract. (doc. 15-1 at 3-4.)

Later the same day, Plaintiff received four automated emails from Defendant with attachments, including a Confirmation of Cancellation of the January 2018 Cruise, as well as a Group Invoice, Guest Manifest, and Receipt for the September 2018 Cruise. (doc. 15-7 at 74-98.)  As with other automated emails sent to Plaintiff, the body of each email began with the following statement: "Please find the documents you requested below." (*Id.* at 78, 79, 81, 98.)  Each email also included download instructions and the contact information for the Reservations Department. (*Id.*)

The Receipt identified the September 2018 Cruise and noted that $6,450 in payments were posted on October 3, 2017. (doc. 15-7 at 74-77.)  The first page of the 16-page Group Invoice was a summary of the new reservation. (*Id.* at 82-97.)  The net charge for the September 2018 Cruise was

---

[4]Plaintiff claims that he cancelled the reservation under the oral contract, which allowed him to cancel without penalty. (doc. 15-1 at 3.)  Defendant claims that his ability to cancel the reservation "without incurring a cancellation fee" was done "[p]er the terms of the Ticket Contract," however. (doc. 8-1 at 2.)

listed at $18,905.20. (*Id.* at 82.) The total amount of payments on record was $12,650, and the

remaining balance due was $6,255.20. (*Id.*) Like the group invoice for the January 2018 Cruise, the

bottom of the first page included the same language:

> This group booking and each individual booked as part of your group shall be
> governed by the terms and conditions of the Cruise/Cruisetour Ticket Contract. A
> copy of the most current version of that contract can be viewed at
> www.RoyalCaribbean.com.

(*Id.*)

Plaintiff also received an updated Group Agreement for the September 2018 Cruise with

blanks for his name and signature and the date. (doc. 15-7 at 69-72.) The standard terms of the Group

Agreement remained the same, and it also included the following statement on the last page of the 4-

page agreement: "All guests traveling in the Group agree to the terms and conditions as stated in the

Cruise Ticket Contract." (doc. 15-7 at 72.) There were no instructions or comments on how to access

or review the terms and conditions in the Ticket Contract, however. The Group Agreement further

provided that Plaintiff was to execute and return it to Defendant on or before October 11, 2017. (*Id.*)

Plaintiff did not review or execute this agreement, however. (doc. 15-1 at 7.)

In January 2018,[5] Defendant notified Plaintiff that it was cancelling his reservation because

it was repositioning the ship for the September 2018 Cruise to another port. (docs. 15-1 at 4.)

Defendant offered Plaintiff either a full refund of the cruise or to re-book his group on another cruise.

(docs. 15-1 5-6; 8-1 at 3.) Defendant claims it offered him "a $100 credit per standard stateroom and

a $200 credit for suites" if he agreed to re-book on another cruise. (doc. 8-1 at 3.) Plaintiff claims that

"at no time did [Defendant] offer $100 per stateroom or $350 per suites to me." (doc. 15-1 at 6.)

---

[5] Defendant claims that it notified Plaintiff of the repositioning via email in November 2017. (doc. 8-1 at 3.) The exact notification date is not relevant and has no bearing on the disposition of the motions, however.

Plaintiff did not re-book on another cruise, and on January 18, 2018, Defendant refunded the $12,650 he paid for the group reservation. (doc. 8-1 at 3.)

**B.    Procedural History**

On May 21, 2018, Plaintiff filed this lawsuit against Defendant in the 116th District Court of Dallas County, Texas, claiming breach of contract, breach of implied-in-fact contract, bad faith denial of the existence of a contract, common law fraud, Texas Deceptive Trade Practices Act violations, and loss of bargain. (*See* doc. 1-3.) On June 28, 2018, Defendant removed this action to federal court on the basis of federal question, diversity of citizenship, and admiralty jurisdiction. (*See* doc. 1.)

On July 27, 2018, Defendant filed a motion to compel arbitration before any other motions or discovery requests were filed. (doc. 8.) On August 17, 2018, Plaintiff filed his response. (doc. 10.) Plaintiff was granted leave to amend his response, which he filed on August 23, 2018. (docs. 15, 16.) On August 30, 2018, Defendant filed its reply in support of its motion to compel. (doc. 17.)

On August 23, 2018, Plaintiff also filed a motion for partial summary judgment. (doc. 14.) On September 12, 2018, Defendant filed its response to the summary judgment motion. (doc. 18.) Plaintiff did not file a reply.

## II.  FEDERAL ARBITRATION ACT

The Federal Arbitration Act (FAA) provides that written arbitration agreements in "any maritime transaction or a contract evidencing a transaction involving commerce" "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2.  It "embodies the national policy favoring arbitration." *Buckeye Check Cashing, Inc. v. Cardegna*, 546 U.S. 440, 443 (2006).  The FAA provides "for orders compelling arbitration when one party has failed or refused to comply with an arbitration agreement." *EEOC v.*

*Waffle House, Inc.*, 534 U.S. 279, 289 (2002) (citing 9 U.S.C. §§ 3-4.)  A court may not compel arbitration under the FAA until it is "satisfied that the making of the agreement for arbitration or the failure to comply therewith is not in issue." 9 U.S.C § 4.

Courts in the Fifth Circuit employ a two-step inquiry when determining a motion to compel arbitration under the FAA.  *See Fleetwood Enters*., *Inc. v. Gaskamp*, 280 F.3d 1069, 1073 (5th Cir. 2002) (citing *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 626 (1985)). The first step is to determine whether the parties agreed to arbitrate the dispute at issue.  *Webb v. Investacorp., Inc.*, 89 F.3d 252, 258 (5th Cir. 1996) (per curiam).  The second step is to determine "whether legal constraints external to the parties' agreement foreclosed the arbitration of those claims."  *Safer v. Nelson Fin. Grp., Inc.*, 422 F.3d 289, 294 (5th Cir. 2005) (quoting *Webb*, 89 F.3d at 258); *accord OPE Int'l LP v. Chet Morrison Contractors, Inc.*, 258 F.3d 443, 445-46 (5th Cir. 2001) (per curiam) (citing *Mitsubishi*, 473 U.S. at 628.).  "Only if the court finds there is an agreement to arbitrate does it consider the second step of whether any legal constraints render the claims nonarbitrable."  *Edwards v. Conn Appliances, Inc.*, No. 3:14-CV-3529-K, 2015 WL 1893107, at *2 (N.D. Tex. Apr. 24, 2015) (citing *Webb*, 89 F.3d at 258).

The first step requires determination of whether the parties agreed to arbitrate the dispute at issue by considering "(1) whether there is a valid agreement to arbitrate between the parties; and (2) whether the dispute in question falls within the scope of that arbitration agreement."  *Safer*, 422 F.3d at 294 (citations omitted); *accord Webb*, 89 F.3d at 258.  In light of the strong federal policy favoring arbitration, "the Supreme Court has held that 'any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration.'"  *Safer*, 422 F.3d at 294 (quoting *Moses H. Cone Mem. Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24-25 (1983)).  This presumption "does not apply to the

determination of whether there is a valid agreement to arbitrate between the parties,'" however. *Will-Drill Res., Inc. v. Samson Res. Co.*, 352 F.3d 211, 214 (5th Cir. 2003) (quoting *Fleetwood Enters. Inc. v. Gaskamp*, 280 F.3d 1069, 1073 (5th Cir. 2002)).

## III. APPLICABLE STANDARD

While the two-step inquiry used to consider a motion to compel arbitration under the FAA is well-settled, "the [Fifth] Circuit has never discussed the appropriate standard for a district court to apply when considering a motion to stay or compel arbitration." *Rain CII Carbon, LLC v. ConocoPhillips Co.*, No. CIVA 09-4169, 2010 WL 148292, at *3 (E.D. La. Jan. 11, 2010); *Grant v. House of Blues New Orleans Restaurant Corp.*, No. CIV.A. 10-3161, 2011 WL 1596207, at *2 (E.D. La. Apr. 27, 2011) (same). "The majority of other circuits apply a summary judgment-like standard, giving deference to the claims of the non-movant." *See Rain CII Carbon*, 2010 WL 148292, at *3 (citing *Clutts v. Dillard's, Inc.*, 484 F.Supp.2d 1222, 1224 (D. Kan. 2007)); *Grant*, 2011 WL 1596207, at *2-4 (collecting cases using summary judgment standard on motion to compel arbitration). "The courts that use the summary judgment standard of Fed.R.Civ.P. 56 have found it appropriate 'because the district court's order compelling arbitration is in effect a summary disposition of the issue of whether or not there had been a meeting of the minds on the agreement to arbitrate.'" *Grant*, 2011 WL 1596207, at *3 (quoting *Century Indem. Co. v. Certain Underwriters at Lloyd's*, 584 F.3d 513, 528, 532 (3rd Cir. 2009) (quotation omitted)) (citations omitted); *see* 9 U.S.C. § 4 (a district court should not order arbitration unless it is "satisfied that the making of arbitration agreement ... is not in issue"). This Court agrees with the weight of authority and likewise applies the summary judgment standard.[6]

---

[6] *See, e.g., BOSC, Inc. v. Board of County Commissioners of County of Bernalillo*, 853 F.3d 1165, 1177 (10th Cir. 2017) (citing *Hancock v. Am. Tel. & Tel. Co.*, 701 F.3d 1248, 1261 (10th Cir. 2012) (applying the similar framework of "summary judgment practice" when considering a motion to compel arbitration)); *Nicosia v. Amazon.com, Inc.*, 834 F.3d 220, 229 (2d Cir. 2016) (quoting *Bensadoun v. Jobe–Riat*, 316 F.3d 171, 175 (2d Cir. 2003) (explaining that courts deciding

Under this well-settled standard, summary judgment is appropriate when the pleadings and evidence on file show that no genuine issue exists as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). "[T]he substantive law will identify which facts are material." *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986). A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Id.*

The movant makes a showing that there is no genuine issue of material fact by informing the court of the basis of its motion and by identifying the portions of the record that reveal there are no genuine material fact issues. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "[I]f the movant bears the burden of proof on an issue, either because he is the plaintiff or as a defendant he is asserting an affirmative defense, he must establish beyond peradventure *all* of the essential elements of the claim or defense to warrant judgment in his favor." *Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1194 (5th Cir. 1986) (emphasis in original). The moving party can also meet its summary judgment burden by "pointing out to the district court that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp.*, 477 U.S. at 325 (internal quotation omitted). There is "no genuine issue as to any material fact [where] a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id.* at 323.

---

motions to compel apply a "standard similar to that applicable for a motion for summary judgment")); *Guidotti v. Legal Helpers Debt Resolution, LLC*, 716 F.3d 764, 774 (3d Cir. 2013) (explaining that where "the non-movant has come forward with enough evidence in response to the motion to compel arbitration to place the question in issue," the Rule 56 summary judgment standard applies); *Magnolia Capital Advisors, Inc. v. Bear Stearns & Co.*, 272 F. App'x 782, 785 (11th Cir. 2008) (citing *Par–Knit Mills, Inc. v. Stockbridge Fabrics Co.*, 636 F.2d 51, 54 n. 9 (3d Cir.1980) (applying "summary judgment standard in deciding what is sufficient evidence to require a trial on the issue of whether there was an agreement to arbitrate")); *Tinder v. Pinkerton Sec.*, 305 F.3d 728, 735 (7th Cir. 2002) (applying the standard required of a party opposing summary judgment under Rule 56 to the evidentiary standard a party seeking to avoid compelled arbitration must meet); *Three Valleys Mun. Water Dist. v. E.F. Hutton & Co., Inc.*, 925 F.2d 1136, 1141 (9th Cir. 1991) ("Only when there is no genuine issue of fact concerning the formation of the agreement should the court decide as a matter of law that the parties did or did not enter into such an agreement[, and the court] should give to the opposing party the benefit of all reasonable doubts and inferences that may arise.").

Once the movant makes this showing, the non-movant must then direct the court's attention to evidence in the record sufficient to establish that there is a genuine issue of material fact for trial. *Celotex Corp.*, 477 U.S. at 324. It must go beyond its pleadings and designate specific facts to show the existence of a genuine issue for trial. *Id.*; *Anderson*, 477 U.S. at 249.[7] While all of the evidence must be viewed in a light most favorable to the motion's opponent, *Anderson*, 477 U.S. at 255 (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158-59 (1970)), neither conclusory allegations nor unsubstantiated assertions satisfy the non-movant's summary judgment burden. *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc); *Topalian v. Ehrman*, 954 F.2d 1125, 1131 (5th Cir. 1992).[8]

When considering a motion to compel arbitration under this summary judgment framework, the moving party must first "present evidence sufficient to demonstrate an enforceable agreement to arbitrate." *Clutts*, 484 F. Supp. 2d at 1224 (citing *Oppenheimer & Co. v. Neidhardt*, 56 F.3d 352, 358 (2d Cir. 1995)). "This burden does not require the moving party to show initially that the agreement would be *enforceable*, merely that one existed." *Hines v. Overstock.com, Inc.*, 380 F. App'x 22, 24 (2d Cir. 2010) (emphasis in original). Once this burden has been met by the movant, the burden shifts to the non-movant to raise a genuine dispute of material fact regarding the existence of an agreement to arbitrate. *See Hancock,* 701 F.3d at 1261. "Just as in summary judgment proceedings, a party

---

[7] "The parties may satisfy their respective burdens by 'citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . admissions, interrogatory answers, or other materials.'" *Rooters v. State Farm Lloyds*, 428 F. App'x 441, 445 (5th Cir. 2011) (citing Fed. R. Civ. P. 56(c)(1)).

[8] Although courts generally liberally construe the pleadings of a *pro se* plaintiff, *see Haines v. Kerner*, 404 U.S. 519 (1972) (per curiam), Rule 56 imposes no obligation "to sift through the record in search of evidence to support a party's opposition to summary judgment." *Adams v. Travelers Indem. Co.*, 465 F.3d 156, 164 (5th Cir. 2006) (quoting *Ragas v. Tenn. Gas Pipeline Co.*, 136 F.3d 455, 458 (5th Cir.1998)). Parties must "identify specific evidence in the record" supporting challenged claims and "articulate the precise manner in which that evidence supports [those] claim[s]." *Ragas*, 136 F.3d at 458 (citing *Forsyth v. Barr*, 19 F.3d 1527, 1537 (5th Cir. 1994)).

13

cannot avoid compelled arbitration by generally denying the facts upon which the right to arbitration rests; the party must identify specific evidence in the record demonstrating a material factual dispute for trial." *See Tinder*, 305 F.3d at 735. "Only when there is no genuine issue of fact concerning the formation of the agreement should the court decide as a matter of law that the parties did or did not enter into such an agreement." *Sandvik AB v. Advent Int'l Corp.*, 220 F.3d 99, 106 (3d Cir. 2000) (quoting *Par–Knit*, 636 F.2d at 54)).

## IV. DEFENDANT'S MOTION TO COMPEL

As noted, a district court must first determine whether a valid arbitration agreement between the parties exist. The moving party must therefore present "evidence sufficient to demonstrate an enforceable agreement to arbitrate." *Clutts*, 484 F. Supp.2d at 1224 (citing *Oppenheimer & Co. v. Neidhardt*, 56 F.3d 352, 358 (2d Cir. 1995)). "The threshold question of whether an arbitration agreement exists at all is 'simply a matter of contract.'" *Bazemore v. Jefferson Capital Sys., LLC*, 827 F.3d 1325, 1329 (11th Cir. 2016) (quoting *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 943 (1995)). "When deciding whether the parties agreed to arbitrate a certain matter . . . courts generally . . . should apply ordinary . . . principles that govern the formation of contracts." *First Options*, 514 U.S. at 944.

When, as in this case, a dispute concerns a maritime contract, the court is to apply "general principles of contract law." *In re Tasch, Inc.*, 46 F. App'x 731, 731 (5th Cir. 2002) (citing 1 Thomas J. Schoenbaum, *Admiralty and Maritime Law* § 5-1 (2d ed.1994) (citing *Har-Win, Inc. v. Consol. Grain & Barge Co.*, 794 F.2d 985 (5th Cir. 1986))); *Cf. The Moses Taylor*, 71 U.S. 411 (1866) (contract for ocean passage is a maritime contract governed by federal law). "These general rules are 'the core principles of the common law of contract that are in force in most states.'" *In Complaint of*

*Moran Philadelphia*, 175 F. Supp. 3d 508, 518 (E.D. Pa. 2016) (quoting *IAP Worldwide Servs. Inc v. UTI United States, Inc.*, No. Civ. A 04–4218, 2006 WL 305443, at *7 (E.D. Pa. Feb. 8, 2006) (internal citations omitted)).  Nevertheless, the court may also consider state contract law to the extent it does not conflict with admiralty principles. *See Ham Marine, Inc. v. Dresser Industries, Inc.*, 72 F.3d 454, 459 (5th Cir. 1995).

Under general principles of contract law, "the formation of a contract requires a bargain in which there is a manifestation of mutual assent to the exchange and a consideration." Restatement (Second) of Contracts § 17 (1981).  In other words, the requisite elements of contact formation in the maritime context are offer, acceptance, and consideration. *See Crowley Marine Servs., Inc. v. Vigor Marine LLC*, 17 F. Supp. 3d 1091, 1094-95 (W.D. Wash. 2014) (citing *Clevo Co. v. Hecny Transportation, Inc.*, 715 F.3d 1189, 1194 (9th Cir. 2013) (citing Restatement (Second) of Contracts §§ 17, 22, 24, 50)); *Pemeno Shipping Co. v. Louis Dreyfus Corp.*, No. CIV.A. H-04-2996, 2006 WL 696555, at *5 (S.D. Tex. Mar. 14, 2006), *aff'd by* 238 F. App'x 6 (5th Cir. 2007) ("Offer and acceptance are necessary elements of a maritime contract.") (citations omitted).

A.    **Express Agreement to Arbitrate**

As a threshold matter, "[f]or a contract to exist, the parties must manifest their mutual assent to be bound by it." *Sw. Airlines Co. v. BoardFirst, L.L.C.*, No. 3:06-CV-0891-B, 2007 WL 4823761, at *4 (N.D. Tex. Sept. 12, 2007) (citing *Alliance Milling Co. v. Eaton*, 86 Tex. 401, 25 S.W. 614, 616 (1894)).

Here, Defendant argues that Plaintiff expressly assented to the Ticket Contract.  (doc. 8 at 6-7.) To meet its initial burden on the issue of whether Plaintiff accepted the Ticket Contract, Defendant relies on Plaintiff's verified complaint, which alleges that he "fully performed all conditions and

obligations under the terms of the contract for booking." (doc. 1-3 at 2.)  By alleging that he "fully performed all conditions and obligations under the terms of the contract for booking," Defendant argues that he essentially acknowledged the Ticket Contract and that he had acted in conformity with its terms. (doc. 8 at 7.)

Plaintiff's statement in the verified complaint "is not a factual allegation sufficient to support the formation of a contract, but rather a conclusion of law 'couched as a factual allegation.'" *Be In, Inc. v. Google Inc.*, No. 12-CV-03373-LHK, 2013 WL 5568706, at *9 (N.D. Cal. Oct. 9, 2013) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 677 (2009) (noting that conclusory statements in a pleading regarding the formation of a contract "are insufficient to establish contract formation because, as a matter of law, they do not establish grounds for the Court to find a manifestation of Defendants' mutual assent to the Terms of Service").  Moreover, in its answer, Defendant expressly denied that "Plaintiff has fully performed all conditions and obligations under the terms of the contract for booking and reserving the wedding cruise including paying the deposit of $12,650 to Defendant." (doc. 3 at 6.)  Defendant has not met its initial burden to compel arbitration based on the pleadings.

Even assuming that Defendant satisfied its initial burden, Plaintiff has shown that a genuine issue of material fact exists with respect to his purported assent to the Ticket Contract.  His declaration states that the only agreement he entered into with Defendant was an oral contract, and that the only terms applicable to their agreement were the ones the parties discussed and agreed to on the phone.[9] (doc. 15-1 at 3.)  Those terms were the discounted rate for the rooms, the final payment deadline, and the cancellation date. (*Id.*)  Plaintiff also submits an email from a salesperson who confirmed those

---

[9] "[O]ral contracts are generally regarded as valid by maritime law." *Kossick v. United Fruit Co.*, 365 U.S. 731, 734 (1961); *see also Fuesting v. Lafayette Parish Bayou Vermilion Dist.*, 470 F.3d 576, 580 (5th Cir. 2006) ("Oral contracts . . . are valid in admiralty.").

terms after the first group reservation. (doc. 15-7 at 26.)  His declaration states that the parties agreed that the same terms from the first group reservation would apply to the second group reservation. (doc. 15-1 at 3.)

Further, on at least two separate occasions, Plaintiff declined to provide his express acknowledgment of, and assent to, the Ticket Contract and its terms and conditions.  After Plaintiff made both group reservations, Defendant sent him a Group Agreement for his signature. (doc. 15-7 at 7-12, 69-72.)  Both agreements referenced the Ticket Contract and stated that its terms applied to all the guests traveling under each group reservation. (*Id.* at 10, 72.)  Each agreement provided a date that Plaintiff was to sign and return it or "THE TERMS AND CONDITIONS SET FORTH HERE IN SHALL NOT BE VALID." (*Id.*)  Plaintiff did not execute either agreement before its respective deadline. (doc. 15-1 at 7.) The other documents referencing the Ticket Contract that Defendant sent to Plaintiff did not require him to assent to its terms, or even acknowledge its receipt.

Plaintiff's declaration supports his claim that he was referencing the parties' oral agreement, and not the terms of the Ticket Contract.  (doc. 15-1.)  He never signed any of the agreements that referenced and incorporated the terms of the Ticket Contract.  Because it is disputed whether Plaintiff fully performed under the Ticket Contract or under an oral agreement, and Plaintiff is entitled to "the benefit of all reasonable doubts and inferences that may arise," Defendant has not established that Plaintiff admitted to assenting to the Ticket Contract by way of the allegations in his verified complaint.  *See Three Valleys*, 925 F.2d at 1141.

**B.    Implied Agreement to Arbitrate**

Defendant next argues that Plaintiff impliedly agreed to the terms of the Ticket Contract because he received notice of the reference to it, it was readily accessible on its website, and the

course of conduct and prior dealings between the parties evince his assent to those terms.[10] (doc. 8 at 7-8.)

"The chief consideration when determining the validity of contractual terms—in contracts with or without a nexus to the internet—is whether the party to be bound had reasonable notice of the terms at issue and whether the party manifested assent to those terms." *One Beacon Ins. Co. v. Crowley Marine Servs., Inc.*, 648 F.3d 258, 269 (5th Cir. 2011).

### 1.    Reasonable Notice

Defendant argues that Plaintiff received notice that his reservation would be subject to the terms and conditions of the Ticket Contract, including its arbitration provision. (doc. 8 at 7.)  It notes that Plaintiff admitted that an invoice for the September 2018 Cruise was emailed to him, and copies of the email and invoice were attached as exhibits to the complaint. (*See* doc. 1-3.)  A paragraph in the invoice provides that the group booking "shall be governed by the terms and conditions of the . . . Ticket Contract," which "can be viewed at www.RoyalCaribbean.com." (*Id.* at 50.)

According to the declaration of Defendant's representative, Plaintiff was emailed an invoice for the September 2018 Cruise. (doc. 8-1 at 2.)  A similar invoice was emailed to him after he booked the earlier group reservation on the January 2018 Cruise. (*Id.*)  The invoice for the January 2018 Cruise included the same paragraph referencing the Ticket Contract and Defendant's website. (*Id.*) The declaration states that "[the Ticket Contract] can be found by clicking the 'Cruise Contract' link

---

[10] In Defendant's reply, it contends for the first time that Plaintiff's prior cruises with it in 1999 and 2012, also demonstrate that he received adequate notice of the terms of the Ticket Contract because he previously agreed to those terms when boarding each vessel. (doc. 17 at 4.)  Because this evidentiary basis was raised for the first time in its reply, Defendant's new argument will not be considered. *See Springs Indus., Inc. v. Am. Motorists Ins. Co.*, 137 F.R.D. 238, 239 (N.D. Tex. 1991); *see, e.g., Pennsylvania Gen. Ins. Co. v. Story*, No. 3:03-cv-0330-G, 2003 WL 21435511, at *1 (N.D. Tex. June 10, 2003) ("[A] court generally will not consider arguments raised for the first time in a reply brief."); *Highpoint Risk Servs. LLC v. Companion Prop. & Cas. Ins. Co.*, No. 3:14-CV-3398-L, 2015 WL 5613336 (N.D. Tex. Aug. 25, 2015), *adopted by* 2015 WL 5666727 (N.D. Tex. Sept. 24, 2015) (declining to consider new arguments made for the first time in a reply brief).  Even if considered, however, the recommendation would remain the same.

at the bottom of [Defendant's] homepage." (*Id.*)  Attached to it is a copy of the Ticket Contract.  (*Id.* at 4-14.)  Section 10 of the Ticket Contract includes an agreement to arbitrate. (*Id.* at 10.)  The declaration states that the "Ticket Contract has not changed since Plaintiff booked his cruises." (*Id.* at 2.)

Defendant argues that "[i]n this electronic age, courts have held that websites can provide one with fair opportunity to review terms and conditions referenced in invoices and other contracts." (doc. 8 at 7.)  It claims that Plaintiff received two invoices that referenced the Ticket Contract and its accessibility on its website, that the very top of the Ticket Contract expressly signaled its importance, and that its express language "states the mandatory requirement for arbitration." (*Id.* at 7, 9.) Because Plaintiff does not dispute that those invoices were emailed to him, Defendant argues that the evidence establishes that he received notice of the terms of the Ticket Contract.  (*Id.*; doc. 17 at 4.)

While Defendant cites several cases where referenced terms available on a website were found to be enforceable, those cases involved the doctrine of incorporation by reference.[11]  Under that doctrine, "a contract will incorporate terms from another document by reference when (1) a particular document is described in such terms that its identity may be ascertained beyond doubt, (2) the parties had reasonable notice of the terms, and (3) the parties manifested assent to the terms." *Tuscany S. Am. Ltd. v. Pentagon Freight Sys., Inc.,* No. 4:12-CV-1309, 2014 WL 4794695, at *2 (S.D. Tex. Sept. 24, 2014) (citing *One Beacon,* 648 F.3d at 267-68 (citing 11 *Williston on Contracts* § 30:25 (4th ed.

---

[11]  *See One Beacon*, 648 F.3d 267 (the plaintiff acknowledged the receipt of a physically-mailed repair service order that incorporated the terms on a website); *Pentecostal Temple Church v. Streaming Faith, LLC,* 2008 WL 4279842 (W.D. Pa. Sept. 16, 20018) (purchase order incorporating terms on a website signed by the plaintiff); *Martinez v. Affordable Seating, Inc.*, 13-16-00103-CV, 2016 WL 6124129, at *1 (Tex. App.—Corpus Christi Oct. 20, 2016, no pet.) (invoice incorporating terms from a website signed by the plaintiff); *Venture Cotton Coop. v. Freeman*, 494 S.W.3d 186, 190 (Tex. App.—Eastland 2015, no pet.) (agreement referencing and incorporating arbitration rules signed by the plaintiff).  Even though Defendant cited *Schwartz v. Comcast,* which did not consider the doctrine of incorporation by reference, that case simply noted that an agreement's existence on the Internet could be used to undermined a plaintiff's claim that he did not have access to a previously-agreed subscriber agreement. 256 F. App'x 515 (3rd Cir. 2011).

1999)).

Defendant does not argue that the doctrine of incorporation by reference should be applied in this case, or explain how the doctrine's application in those cases is relevant here. For the doctrine to apply, the document incorporating the terms of an external document must itself be a contract. *See Tuscany,* 2014 WL 4794695, at *2 ("a *contract* will incorporate terms from another document by reference") (emphasis added). In fact, to incorporate the terms of another document in Texas, "the writing referencing another writing must be *signed.*" *Indicium Digital Network, LLC v. CDW Direct, LLC*, No. EP-17-CV-00054-FM, 2018 WL 2410991, at *5 (W.D. Tex. Jan. 19, 2018) (emphasis added)[12] (citing *In re Prudential Ins. Co. of Am.*, 148 S.W.3d 124, 135 (Tex. 2004); *Owen v. Hendricks*, 433 S.W.2d 164, 166 (Tex. 1968)); see also *Int'l Corrugated & Packing Supplies, Inc. v. Lear Corp.*, No. EP-15-CV-00405-DCG, 2018 WL 1041309, at *5 (W.D. Tex. Feb. 22, 2018) ("Under Texas law, in order to incorporate the unsigned Terms and Conditions into the purchase orders, the purchase orders must be signed by the party sought to be charged.")[13] Because Plaintiff never executed an agreement that referenced and incorporated the terms of the Ticket Contract, the doctrine of incorporation by reference does not apply.

Even if the doctrine of incorporation by reference was properly considered, Defendant must demonstrate that Plaintiff had reasonable notice of the incorporated terms. "Notice of incorporated terms is reasonable where, under the particular facts of the case, '[a] reasonably prudent person should

---

[12] *See Indicium Digital Network*, 2018 WL 2410991, at *5 ("the court notes that it is not aware of any decisions under Texas law where an unsigned writing successfully incorporated by reference another unsigned writing").

[13] Further, both Texas cases Defendant cites also involved consumer transactions where the consumer signed the invoice that referenced and incorporated the terms on a website. *See Martinez*, 2016 WL 6124129, at *1 (party opposing the motion to compel arbitration signed the invoice incorporating terms from a website); *Venture Cotton Coop*, 494 S.W.3d at 190 (party opposing arbitration signed the agreement referencing and incorporating arbitration rules accessible on a website).

have seen' them." *One Beacon,* 648 F.3d at 268 (quoting *Coastal Iron Works, Inc. v. Petty Ray Geophysical, Div. of Geosource, Inc.*, 783 F.2d 577, 582 (5th Cir. 1986)).  Defendant does not explain why the facts of this case demonstrate reasonable notice; it only generally argues that a website can provide "fair opportunity" to review terms and conditions of a contract. (doc. 8 at 7.)  This is not the standard for reasonable notice, and Defendant fails to satisfy its initial burden.

Even if Defendant was able to show that the emails and its attached invoices provided reasonable notice of the Ticket Contract and its terms and conditions, Plaintiff provides sufficient evidence disputing the reasonableness of notice.  While it is clear that Plaintiff actually received the Group Invoices, he declares that he was not aware that the documents contained terms and conditions that purported to govern his group reservations. (doc. 15-1 at 4.)  He states that arbitration and the terms of a ticket contract were never discussed during the "numerous communications on the phone" he had with Defendant's employees.  (*Id.*)  He further states he never saw or read the terms and conditions of the Ticket Contract, and did not agree to those terms. (*Id.* at 9.)  As noted, the Group Invoices and other documents sent to Plaintiff were submitted as attachments to automated emails. Nothing in the body of those emails, however, gave notice to the Ticket Contract or even suggested that each attachment might contain the terms and conditions of a contractual agreement. *See Dakota Foundry, Inc. v. Tromley Indus. Holdings, Inc.*, 891 F. Supp. 2d 1088, 1098 (D.S.D. 2012), *aff'd by* 737 F.3d 492 (8th Cir. 2013) (finding that even though some emails between parties included attachments that referenced an agreement to arbitrate, it was not incorporated by reference when the emails did not call to the attention of the party that the attachment contained additional contract terms).

Plaintiff cites *Specht v. Netscape Communications Corporation,* in support of his argument that

he did not receive reasonable notice of the Ticket Contract. 306 F.3d 17, 20 (2d Cir. 2002). A detailed factual recount of *Specht* is instructive. There, Netscape sought to compel arbitration of a class action dispute involving a "plug-in" program it offered to enhance the functioning of its separate browser program. The plug-in program and the browser program were subject to two separate license agreements. Each license agreement had its own arbitration provision. Although the browser program could have been obtained independently of the plug-in program, the plaintiffs downloaded and installed both programs at the same time. The class action lawsuit was limited to claims involving the plug-in program, however.

Each plaintiff visited Netscape's website and accessed a webpage that displayed a button to be clicked to download the browser and the plug-in. Below that button was text that would only have been visible to the plaintiffs had they continued to scroll down to the bottom of the webpage. The text advised the user to review and agree to the terms of the plug-in software agreement before downloading and using the software. The text was embedded with a hyperlink that would direct the user to that agreement. The plaintiffs testified that they did not see this text before clicking on the download button.

After the plug-in program was downloaded and opened by the user, the installation of the browser program was initiated. Unlike with the download of the plug-in, the entire text of the browser program's license agreement was immediately shown to the user. To continue with the installation, the user was required to scroll through the entire agreement and then click on a "Yes" button to indicate that they accepted the browser's license terms. A user could not install the browser without clicking the "Yes" button.

Netscape argued that the plaintiffs had reasonable notice of the plug-in license agreement

22

because a reference to its terms was on the same webpage used to download the program, which they would have seen had they scrolled to the bottom of the page before clicking the download link. 306 F.3d at 30. The Second Circuit acknowledged that a party's failure to read the terms of a contract before signing is an insufficient basis to avoid the enforcement of its terms. *Id.* Nonetheless, it was "not persuaded that a reasonably prudent offeree in these circumstances would have known of the existence of license terms." *Id.* at 31. Though reference to license terms were located below the link to download the plug-in program, it was insufficient to show that the plaintiffs "reasonably should have concluded that this portion contained a notice of license terms." *Id.* at 32. When the plaintiffs downloaded the plug-in, they were responding to an offer that did not carry an immediately visible notice of the existence of license terms or require unambiguous manifestation of assent to those terms." *Id.* at 31. In other words, "the plaintiffs' apparent manifestation of consent was to terms contained in a document whose contractual notice was not obvious." *Id.* (internal citations and quotations omitted).

Though the factual circumstances of *Specht* are different, its analysis is persuasive. Here, the reference to the Ticket Contract and its terms was not presented to Plaintiff at the time he booked either group reservation. Reference to it were contained in invoices emailed to him after he paid the deposit for the first booking, and after his deposit was transferred for the second booking. Nothing in either invoice required Plaintiff to manifest assent to the terms of the Ticket Contract, however. When booking both reservations, Plaintiff was "required neither to express unambiguous assent to" the Ticket Contract, "nor even to view [its] terms or become aware of their existence before proceeding with" each booking. *See Specht*, 306 F.3d at 23. Even though invoices containing a reference to the Ticket Contract were eventually emailed to Plaintiff after each booking, the reference

was not immediately displayed in those emails, but inside separate attachments.  "A reference to the existence of [] terms on a submerged screen is not sufficient to place consumers on inquiry or constructive notice of those terms." *Id.* at 32.  The emails themself would not give a reasonably prudent person sufficient notice that the attached documents contained contractual terms and conditions, including an agreement to arbitrate.  In effect, the terms of the Ticket Contract were "submerged" in attachments to the emails.

Defendant has not shown that Plaintiff was expressly advised that either reservation would be subject to additional terms at any point, and none of the emails sent to him stated that the attachments were contractual agreements or contained contractual terms.  Accordingly, Plaintiff did not have reasonable notice that his agreement with Defendant would be subject to the terms of the Ticket Contract.

Defendant has not shown the absence of a genuine issue of material fact with respect to Plaintiff having reasonable notice of the reference to the terms of the Ticket Contract.  It has failed to demonstrate that notice of the terms of the Ticket Contract, as presented in the invoices emailed to Plaintiff, was reasonable.  For this reason alone, its motion to compel should be denied.

## 2. *Manifest Assent*

Even if Defendant demonstrated that Plaintiff was provided reasonable notice of the Ticket Contract, it would also need to provide evidence of his assent to its terms.  "Mutual manifestation of assent" is the "touchstone" of a binding contract. *Specht*, 306 F.3d at 29 (citations omitted).  In the absence of a signed contract, a mutual agreement may still be implied from the circumstances. *Haws & Garrett Gen. Contractors, Inc. v. Gorbett Bros. Welding Co.*, 480 S.W.2d 607, 609 (Tex. 1972).  A meeting of the minds to the terms of such an agreement will be "implied from and evidenced by [the

24

parties'] conduct and course of dealing, the essence of which is consent to be bound." *Id.*; *see also McCarty v. Bigge Crane & Rigging Co.*, No. 5:16-CV-268, 2018 WL 2323277, at *4 (S.D. Tex. Mar. 21, 2018) (citing *id.*) ("The terms of an implied contract arise from the parties' conduct and course of dealing."); 17A Am. Jur. 2d Contracts § 13 ("The terms of a contract implied in fact can be inferred from the acts of the parties or the general course of dealing between the parties ...."). Nevertheless, "[t]he conduct of a party is not effective as a manifestation of his assent unless he intends to engage in the conduct and knows or has reason to know that the other party may infer from his conduct that he assents." Restatement (Second) of Contracts § 19 (1981); *accord Haws & Garrett*, 480 S.W.2d at 609; *accord Karl Rove & Co. v. Thomburgh*, 39 F.3d 1273, 1291 (5th Cir. 1994).

Here, Defendant argues that Plaintiff's prior conduct and course of dealings with it confirm that his booking was governed by the Ticket Contract. (doc. 8 at 8.)  It notes that Plaintiff previously booked the January 2018 Cruise, and an invoice was emailed to him.  It also notes that he was able to cancel that reservation without penalty as provided for in the terms of the Ticket Contract. Defendant states that a second invoice with the same reference to the Ticket Contract was sent to Plaintiff after he booked the September 2018 Cruise.  Because "the circumstances show that he had twice been presented with notice of the terms of the Ticket Contract," Defendant argues that his consent to the Ticket Contract can be implied from and evidenced by their prior conduct and course of dealing. (doc. 8 at 8.)

In support of its argument, Defendant cites *Haws & Garrett General Contractors, Inc. v. Gorbett Brothers Welding Co.*, which recognized that the circumstances of a particular transaction may give rise to an implied contract in light of the prior dealings between the parties. 480 S.W.2d at 609.  In such a case, the element of mutual assent can be inferred from those circumstances.  In that

case, a dispute arose between a contractor and an equipment rental company regarding damage to a bridge allegedly caused by the company's crane. The contractor telephoned the company to rent cranes for a bridge project and a work order form was printed by the company after the phone call. The work order contained an indemnity agreement and was signed by the contractor's employee, but the signature was obtained after the bridge was damaged. The company argued that because the contractor previously leased equipment from it under similar circumstances, "the contract of indemnity . . . arose out of the circumstances of the particular transaction in question in the light of prior dealings between the parties." 480 S.W.2d at 609.

Even though there was evidence that the contractor leased equipment from the company "on prior occasions in a similarly informal manner," the court found that the evidence failed to give rise to an implied contract because there was insufficient evidence that the parties agreed to the indemnity terms in their prior dealings. 480 S.W.2d at 610. Because there was no evidence of mutual assent in those prior dealings, the circumstances did not constitute evidence to support a finding of mutual assent in a subsequent transaction between the parties.

Likewise, in this case, Defendant argues that the first group reservation constitutes a course of conduct or prior dealing between the parties, to be used as evidence that Plaintiff accepted the terms of the Ticket Contract in the second reservation. There is no conclusive evidence that Plaintiff expressly assented to the terms of the Ticket Contract at the time of the first reservation, however. Without evidence of Plaintiff's express assent when he booked the January 2018 Cruise, course of conduct and prior dealing will not support evidence of mutual assent of the Ticket Contract at the time of the second reservation. While an invoice referencing the Ticket Contract was sent to Plaintiff after two separate reservations, Defendant fails to provide evidence that Plaintiff agreed to the Ticket

26

Contract after either booking.

Even if Defendant met its initial burden on the existence of an implied contract, Plaintiff provides evidence of a genuine dispute, as shown by the two Group Agreement forms sent to Plaintiff that he never executed. The record shows that on the two occasions that Plaintiff was presented with the Ticket Contract, and his express assent to be bound was requested, he did not assent. There is a genuine issue of material fact on whether Plaintiff actually rejected the terms of the Ticket Contract when he failed to executed and return each agreement by its respective deadline.

Accordingly, Defendant has failed to meet its summary-judgment-like burden of showing the lack of a genuine issue of material fact surrounding Plaintiff's acceptance of the Ticket Contract.

### 3. *Contractual Benefits Obtained*

Defendant also argues that Plaintiff took advantage of a cancellation provision in the Ticket Contract that allowed him to cancel the first group reservation without penalty because it was cancelled more than ninety days before the sail date. (doc. 8 at 8.) The prior reservation was cancelled, and the deposit from that reservation was applied to the new reservation. (doc. 15-7 at 82.) Defendant's supporting declaration states that "[p]er the terms of the Ticket Contract, [Plaintiff] was able to cancel his cruise without incurring a cancellation fee." (doc. 8-1 at 2.) By taking advantage of the cancellation provision in the Ticket Contract, Defendant argues that Plaintiff has acknowledged the Ticket Contract and accepted its remaining terms and conditions including the arbitration provision. (*Id.* at 8-9.)

To the extent Defendant argues that Plaintiff's receipt of a benefit under the Ticket Contract establishes mutual assent, it fails to provide any authority in support of the argument. Nevertheless, Plaintiff presents a genuine issue of material fact precluding a summary judgment finding on this

issue. In his affidavit, Plaintiff admits that he was able cancel the January 2018 Cruise without incurring a penalty and that all of his deposits were refunded. (doc. 15-1 at 2.) He counters that he did not take advantage of any cancellation provision contained in the Ticket Contract, but was acting under the terms of the parties' oral contract. (doc. 15 at 6.) He states that he was not aware of the Ticket Contract until after the commencement of this lawsuit. (*Id.*)

Plaintiff's evidence supports his claim that he was able to cancel his reservation under the terms of an oral agreement. Even though Defendant's representative's declaration states that the reservation was cancelled under the terms of the Ticket Contract, there is no evidence that it was communicated to Plaintiff that the penalty-free cancellation of the first group reservation was done in accordance with the terms of the Ticket Contract. In fact, the group cancellation notice that was emailed to Plaintiff simply stated that the group reservation on the January 2018 Cruise "was canceled according to group policy or at your request." (doc. 15-7 at 80.) "Group policy" is not defined, and there are no references to the Ticket Contract in this notice. (*Id.*)

At minimum, there is a genuine fact dispute on whether Plaintiff received a benefit under the terms of the Ticket Contract, or that the penalty-free cancellation was done in accordance with an oral agreement. *Goad v. St. David's Healthcare P'ship, L.P., LLP*, No. 1-16-CV-044 RP, 2016 WL 2853573, at *4 (W.D. Tex. May 13, 2016) (concluding the existence of a genuine fact issue regarding the validity of the arbitration agreement between the parties precluded the court from determining as a matter of law whether the arbitration agreement was valid and enforceable). Given the evidence and Plaintiff's unequivocal assertions that he has been proceeding under the terms agreed to in the parties' oral contract, Plaintiff's prior cancellation does not show that he obtained a benefit under the Ticket Contract, and does not constitute undisputed evidence that he agreed to be bound by the terms of the

Ticket Contract.

Defendant has failed to demonstrate that Plaintiff agreed to arbitrate under the terms and conditions of the Ticket Contract. There is insufficient proof establishing the existence of an agreement to arbitrate between the parties. Because Defendant has not satisfied the first step, there is no need to proceed to the second step. *See Webb*, 89 F.3d at 258.

Accordingly, Defendant's motion to compel arbitration should be denied.

## V. PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

On August 23, 2018, Plaintiff filed a partial motion for summary judgment on his "loss of bargain" claim against Defendant, and his claim for attorneys' fees under Tex. Civ. Prac. & Rem. Code § 37.009. (doc. 14 at 5.)[14]

### A.     Loss of Bargain

As a threshold matter, loss of bargain is not an independent cause of action, but a measure of damages. *See Hininger v. Case Corp.*, 23 F.3d 124, 126 n. 1 (5th Cir. 1994) (quoting *Nobility Homes of Texas, Inc. v. Shivers*, 557 S.W.2d 77, 78 n. 1 (Tex.1977)) (explaining that "loss of bargain," or expectation loss, is the difference between the value of what is received and its value as represented). It is premised on the doctrine that "damages for a breach of a contract should put the injured party in the position it would have been in if both parties had performed their contractual duties." *Loss-of-*

---

[14]   Defendant argues that the motion for summary judgment is premature and requests more "time to conduct discovery so that it may more fully respond to the motion." (doc. 19 at 5.) It does not identify the specific discovery or information it seeks, however. (*Id.*) Rule 56(d) provides that if a party "shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition[,]" courts may either defer considering a motion for summary judgment or deny it and permit additional time for discovery. Fed. R. Civ. P. 56(d). Rule 56(d) motions should be liberally granted, *see Int'l Shortstop, Inc. v. Rally's Inc.*, 939 F.2d 1257, 1267 (5th Cir. 1991) (addressing prior Rule 56(f)), but such deferral requires Defendant to show how the discovery will establish a genuine issue of material fact. *See Washington v. Allstate Ins. Co.*, 901 F.2d 1281, 1286 (5th Cir. 1990). A party "may not simply rely on vague assertions that additional discovery will produce needed, but unspecified, facts." *Am. Family Life Assurance Co. of Columbus v. Biles*, 714 F.3d 887, 894 (5th Cir. 2013). Even liberally construing Defendant's bare assertion as a Rule 56(d) motion, it has not met its burden to show entitlement to time for discovery on the legal issues presented in Plaintiff's summary judgment motion, so any Rule 56(d) motion is denied.

*Bargain Rule*, Black's Law Dictionary (10th ed. 2014).  Therefore, Plaintiff's motion for summary judgment his loss of bargain claim should be denied as a matter of law.

## B.    Breach of Contract

Plaintiff argues that Defendant acknowledges "contracting with Plaintiff on October 2, 2017 for a group wedding booking;" "denying Plaintiff his wedding cruise at a heavily discounted rate;" and "refusing to provide Plaintiff his wedding cruise." (doc. 14 at 5.)  He alleges that despite giving Defendant "ample opportunity to honor [its] commitment to his heavily discounted rate," it simply offered him "a cruise at approximately double the cost of his heavily discounted rate." (*Id.*)  The Court construes his motion as seeking partial summary judgment of his breach of contract claim.[15]

To establish a maritime breach-of-contract claim, a plaintiff must demonstrate "(1) the existence of an agreement, (2) adequate performance of the contract by the plaintiff, (3) breach of contract by the defendant, and (4) damages." *See Eternity Global Master Fund Ltd. v. Morgan Guar. Trust Co. of N.Y.*, 375 F.3d 168, 177 (2d Cir. 2004); *see also F.W.F., Inc. v. Detroit Diesel Corp.*, 494 F. Supp. 2d 1342, 1360 (S.D. Fla. 2007), *aff'd by* 308 F. App'x 389 (11th Cir. 2009) (identifying the essential elements of a breach of maritime contract claim as: (1) a valid contract; (2) a material breach; and (3) damages).  As noted, the basic contractual elements of offer, acceptance, and consideration are required when forming an enforceable maritime contract. *See Crowley Marine*, 17 F. Supp. 3d at 1094-95.  "Under maritime law, a binding oral contract is created when the parties reach agreement on all material terms of a contract and clearly express their intention to be bound by those terms." *May Ship Repair Contr. Corp. v. Barge Columbia New York*, 160 F. Supp.2d 594, 597 (S.D.N.Y. 2001) (citing *Orient Mid–East Lines v. Albert E. Bowen, Inc.*, 458 F.2d 572, 574 (2d Cir. 1972)).

---

[15] Defendant also construed Plaintiff's motion as seeking partial summary judgment on his breach of contract claim. (*See* doc. 19.)

Plaintiff contends that the summary judgment evidence establishes that the parties entered into an oral contract.  His declaration states that he entered into an oral agreement with Defendant's salesperson on January 15, 2017, to reserve "30 plus cabins at a heavily discounted price" on the January 2018 Cruise. (doc. 14 at 8.)  He paid Defendant a deposit and the salesperson "confirmed that they had received payment" and his "heavily discounted cabins were guaranteed." (*Id.*)  On October 2, 2017, he entered into an oral agreement with Defendant's salesperson to transfer his reservation and deposit to the September 2018 Cruise. (*Id.*)  Defendant's salesperson confirmed that the same terms applicable to the January 2018 Cruise reservation, would also apply to the reservation on the September 2018 Cruise. (*Id.* at 10.)  Defendant transferred his $12,650 deposit to the September 2018 Cruise reservation. (*Id.*)  Plaintiff contends that Defendant's representative's declaration and an invoice from Defendant provides additional summary judgment evidence of the parties' oral contract. (*Id.* at 5, 25-30.)  Plaintiff has met his summary judgment burden to show the existence of an oral contract.

The burden now shifts to Defendant to show a genuine issue of material fact for trial regarding the existence of an oral contract.  Defendant argues that summary judgment is inappropriate because a factual disagreement about the contract at issue exists. (doc. 19 at 6).  Defendant also refers to its representative's declaration. (*Id.*)  It acknowledged that Plaintiff was able to cancel the group reservation on the January 2018 Cruise and re-book the reservation on the September 2018 Cruise, and states that the cancellation and re-booking was done in accordance with the terms of the Ticket Contract. (doc. 14 at 25.)  It provides evidence supporting Defendant's claim that the Ticket Contract is the actual agreement between the parties. (doc. 19 at 6.)  Because the declaration raises a genuine issue of material fact with respect to the identity of the contract in this dispute, Defendant has

sustained its burden to avoid summary judgment. *See Fontenot*, 780 F.2d at 1194.[16]

Accordingly, Plaintiff's motion for partial summary judgment on his breach of contract claim should be denied.

**C.      Attorneys' Fees**

Plaintiff also seeks summary judgment on his claim for attorneys' fees on his breach of contract claim under Tex. Civ. Prac. & Rem. Code § 38.001. (doc. 14 at 5.)  Because it has been recommended that Plaintiff's motion for summary judgment on his breach of contract claim should be denied, he is not entitled to attorneys' fees under § 38.001. *See* Tex. Civ. Prac. & Rem. Code § 38.001 (providing for recovery of attorneys' fees only for "valid claims"); *see Rodgers v. RAB Investments, Ltd.*, 816 S.W.2d 543, 551 (Tex. App.–Dallas 1991, no writ) (noting that a party "must prevail" on the cause of action for which attorneys' fees are available).

Plaintiff's motion for partial summary judgment should be denied.

### VI.  RECOMMENDATION

Defendant's motion to compel arbitration should be **DENIED**.  Plaintiff's motion for summary judgment should be **DENIED**.

**SO RECOMMENDED** this 26th day of February, 2019.

IRMA CARRILLO RAMIREZ
UNITED STATES MAGISTRATE JUDGE

---

[16] Defendant also argues that summary judgment of Plaintiff's breach of contract claim is inappropriate because it also denies breaching the only legitimate contract between the parties and argues that there is no evidence of injury. (doc. 19 at 6-7.)  Based on the factual dispute regarding the existence of a valid contract, it is not necessary to consider the remaining elements of Plaintiff's breach of contract claim.

## INSTRUCTIONS FOR SERVICE AND
## NOTICE OF RIGHT TO APPEAL/OBJECT

A copy of these findings, conclusions and recommendation shall be served on all parties in the manner provided by law. Any party who objects to any part of these findings, conclusions and recommendation must file specific written objections within 14 days after being served with a copy. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b). In order to be specific, an objection must identify the specific finding or recommendation to which objection is made, state the basis for the objection, and specify the place in the magistrate judge's findings, conclusions and recommendation where the disputed determination is found. An objection that merely incorporates by reference or refers to the briefing before the magistrate judge is not specific. Failure to file specific written objections will bar the aggrieved party from appealing the factual findings and legal conclusions of the magistrate judge that are accepted or adopted by the district court, except upon grounds of plain error. *See Douglass v. United Servs. Automobile Ass'n*, 79 F.3d 1415, 1417 (5th Cir. 1996).

IRMA CARRILLO RAMIREZ
UNITED STATES MAGISTRATE JUDGE

33